UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

UNITED STATES OF AMERICA,                    CRIMINAL NO. 07-223 (PJS/JSM)

      Plaintiff,

v.                                           REPORT AND RECOMMENDATION

EDUARDO SOTO (1),
OSCAR JAVIER ESTRADA (2), and
JUAN MANUEL ESTRADA (3),

Defendants.

      JANIE S. MAYERON, United States Magistrate Judge

The above matter came on for hearing before the undersigned upon defendant Eduardo Soto's Motion to Suppress Tangible Evidence [Docket No. 35]; Oscar Javier Estrada's Pretrial Motions for Suppression of all Physical Evidence [Docket No. 43] and for Suppression of all Statements [Docket No. 44]; and Juan Manuel Estrada's Motion to Suppress Evidence [Docket No. 48].

Assistant United States Andrew Winter appeared on behalf of the Government; Kassius O. Benson, Esq. appeared on behalf of defendant Eduardo Soto, Thomas C. Plunkett, Esq. appeared on behalf of defendant Oscar Javier Estrada, and Kenneth M. Bottema, Esq. appeared on behalf of defendant Juan Manuel Estrada.  All of the defendants were  personally present.  The matter was referred to the undersigned by the District Court for a Report and Recommendation pursuant to 28 U.S.C. § 636 (b)(1)(B).

Based upon the pleadings, the pre-hearing submissions, post-hearing submissions, exhibits submitted at the hearing, and testimony taken from Deputy David Fry and Trooper Robert Frisby it is recommended that:

1.      Defendant Eduardo Soto's Motion to Suppress Tangible Evidence [Docket No. 35] be **DENIED**;

2.      Defendant Oscar Javier Estrada's Pretrial Motion for Suppression of all Physical Evidence [Docket No. 43] be **DENIED**;

3.      Defendant Oscar Javier Estrada's Motion for Suppression of all Statements [Docket No. 44] be **DENIED** in part and **DENIED** in part as moot with regards to statements made by defendant after he made a request for an attorney; and

4.      Defendant Juan Manuel Estrada's Motion to Suppress Evidence [Docket No. 48] be **DENIED**.

## I.      FACTUAL BACKGROUND

### A.      <u>Preliminary Investigation</u>

Deputy David Fry, a task force officer with the Drug Enforcement Agency ("DEA"), testified at the suppression hearing that his participation in the investigation of defendants began with the apprehension of an individual for possession of methamphetamine.  Tr. 12.  The father of the individual arrested told Deputy Fry that they had sold a truck for cash to a Hispanic male.  Id.  Deputy Fry ran the vehicle identification number and the license plate of the vehicle sold and discovered it was registered to a residence in Minneapolis, Minnesota.  Tr. 12-13. Deputy Fry also testified that he had learned on December 7, 2006, that law enforcement officers in

Nevada made a traffic stop, during which officers recovered $102,000 in cash.  Tr. 13.

The passenger in this vehicle was defendant Juan Manuel Estrada ("Juan Estrada").  Id.

In addition, the registered owner of the vehicle, Cynthia Uribe Lopez, listed her address

as the same residence in Minneapolis, Minnesota, as the residence for the truck sold for

cash.  Id.  Deputy Fry approached the landlord of the Minneapolis residence in March of

2007, and learned that the renters had abandoned the property approximately three

months earlier.  Tr. 13-14.  The owners of this residence gave Deputy Fry permission to

search the residence.  Tr. 14.  During the search, officers discovered heat sealing

packaging, which was consistent with packaging material used to package money and

narcotics, and what appeared to be drug notes, handwritten telephone numbers, cell

phone boxes, rubber bands, and other packaging materials.  Tr. 14-15.  Officers also

discovered mail or documents in the name of Cynthia Uribe Lopez, and mail belonging

to defendant Eduardo Soto ("Soto").  Id.  Based on the phone numbers and subscriber

information obtained from the phones at the Minneapolis residence, Deputy Fry

determined that a high frequency of calls came from a residence located in Brooklyn

Center.  Tr. 15.

On May 17, 2007, Deputy Fry began surveillance of the Brooklyn Center

residence.  Id.  During his surveillance, Deputy Fry observed a gold Nissan Maxima

registered to defendant Eduardo Soto ("Soto") pull up to the Brooklyn Center residence.

Tr. 16.  The Maxima was occupied by two Hispanic males.  Id.  Deputy Fry also

observed another male, identified as defendant Juan Estrada, leave the Brooklyn

Center residence and enter the Maxima.  Id.  Officers followed the Maxima as it left the

3

Brooklyn Center residence.  Id.  The Maxima traveled to a restaurant located in Minneapolis, where the occupants stayed for approximately 45 minutes.  Id.  Officers then followed the vehicle to the drop-off area at the Humphrey Airport Terminal in Bloomington, Minnesota.  Tr. 17.  The three occupants of the vehicle exited and stayed by the curbside outside of the terminal for approximately 15 minutes.  Id.  None of the individuals went into the terminal and no one checked any baggage.  Id.  Eventually, an unidentified male in the Maxima, who was carrying a blue shoulder strap bag, spoke with an individual who arrived in a blue Chevy pickup truck, and then the unidentified male went inside the airport.  Tr. 18.  Defendants Soto and Juan Estrada got back into the Maxima, and the blue Chevy pickup and the Maxima departed the airport, with officers following from behind.  Tr. 18-19.  The pickup truck was registered to the Brooklyn Center residence.  Tr. 20.  The two vehicles split up, and officers followed the Maxima to a residence in Fridley, Minnesota.  Tr. 20-21.  The blue pickup was also parked in the driveway of this residence.  Tr. 22.

Over the next couple of weeks, officers continued their surveillance of the Fridley residence.  Id.  Deputy Fry testified that he never observed any of the defendants in the possession of narcotics prior to June 4, 2007, nor did he conduct or authorize a controlled buy at the Fridley residence, or observe narcotics at the residence.  Tr. 42, 45.

## B.   Stop and Search of the Gold Maxima

On June 4, 2007, officers were conducting surveillance of the Fridley residence when Deputy Fry testified that a Hispanic male got into the Maxima; the person then

exited the vehicle and entered the Fridley residence.  Tr. 23-24.  Deputy Fry identified this individual as defendant Oscar Javier Estrada ("Oscar Estrada").  Tr. 24.  While Oscar Estrada was in the car, Deputy Fry observed him leaning towards the center portion of the dash for a considerable amount of time, which Deputy Fry found unusual and for a longer period of time that it would take a person to reach into the glove compartment and grab a document.  Tr. 23-24.

Both Oscar Estrada and Soto exited the Fridley residence, entered the Maxima, and drove off with officers following them.  Tr. 24-25.  Defendants were followed to Highway 52 and the St. Paul Airport.  Tr. 25.  The defendants were then observed to perform what Deputy Fry characterized as a "cleaning maneuver," where defendants exited Highway 52 and then immediately entered the highway again.  Tr. 25.  Deputy Fry characterized the "cleaning maneuver" as suspicious.  Id.  Officers terminated their pursuit, as they were concerned about being revealed as tailing the Maxima.  Id.

Officers went back to the Fridley address.  Tr. 26.  Five minutes after their arrival, Oscar Estrada and Soto arrived in the Maxima and went into the residence.  Id. Approximately 10-15 minutes later, Oscar Estrada exited the Fridley residence and entered the Maxima where he again spent an unusual amount of time leaning towards the center portion of the vehicle.  Id.  He then exited the vehicle and entered the residence.  Id.  A short while later, officers observed Oscar Estrada and Soto exit the Fridley residence and enter the Maxima with Oscar as the driver and Soto as the passenger.  Tr. 26-27.  Officers followed the Maxima as it left the Fridley residence.  Tr. 27.

At this point, Deputy Fry contacted Minnesota State Patrol Dispatch and instructed the State Patrol to initiate a traffic stop, based on their own probable cause, and that if they could not find any legal reason to stop the vehicle, then the vehicle should not be stopped.  Tr. 27, 41.  Deputy Fry never told Dispatch that he had probable cause to stop the vehicle, nor did Deputy Fry ever speak to the trooper who stopped who stopped the Maxima prior to stop.  Tr. 42, 56.  Deputy Fry did believe he had a reasonable suspicion to believe that the occupants of the Maxima were  engaged in criminal activity at the time he asked the State Patrol to stop the car.  Tr. 61.

Minnesota State Patrol Trooper Robert Frisby, a canine handler for the Department, testified that on June 4, 2007, he was contacted by Dispatch to investigate a particular vehicle in the northern metro area.  Tr. 64.  Specifically, he was advised that DEA agents had observed a vehicle that they wanted stopped, and was advised that he should have his own legal reason to stop and search the vehicle.  Tr. 64, 88.  Trooper Frisby testified that it was his goal to find a basis to stop the vehicle, as the DEA had requested, however, he also stated that he would not have stopped the Maxima if it had not committed a traffic violation.  Tr. 90, 104.  Trooper Frisby did not speak with Deputy Fry before the stop of the Maxima.  Tr. 98-99.

Trooper Frisby located the Maxima traveling westbound on I-94 from Shingle Creek Parkway in Brooklyn Center.  Tr. 64-65.  At that point, Trooper Frisby caught up to the Maxima, which signaled a right hand turn and exited down the ramp to Brooklyn Boulevard.  Tr. 65. Trooper Frisby testified that while the Maxima was exiting down the

Brooklyn Boulevard ramp, he observed it drift over the right fog line,[1] with both passenger tires, approximately halfway down the ramp.  Tr.  65, 99, 107.  According to Trooper Frisby, drifting over the fog line is a violation of Minnesota traffic laws.  Id.  In particular, Trooper Frisby stated that it is a violation of Minn. Stat. § 169.18, subd. 7(a), which prohibits a vehicle from leaving its lane without properly signaling, and Minn. Stat. § 169.19, subd. 4, which pertains to maintaining a direction of travel and not changing from that direction of travel until it safe to do so and signaling it.  Tr. 65.  Drifting over the fog line was the sole basis for the stop.  Tr. 91-92.

After Trooper Frisby observed the Maxima commit what he considered to be a traffic violation, he waited until the Maxima turned westbound onto Brooklyn Boulevard and then turned on his emergency lights to stop the Maxima.  Tr. 66.  Once Trooper Frisby pulled over the Maxima, he approached the vehicle on the passenger side.  Tr. 68. Trooper Frisby testified that as he approached the passenger side of the vehicle, he observed the passenger reaching around inside of the vehicle.  Tr. 68-69.  Given that Trooper Frisby knew, through Dispatch, that this vehicle was involved with a drug investigation and that there might be weapon in vehicle, he became concerned for his safety when he observed the passenger reaching around inside of the vehicle.  Tr. 69, 88.  Trooper Frisby identified himself to the occupants in the vehicle.  Id.  The passenger, who identified himself as Soto, controlled the conversation with Trooper Frisby, and his English was good.  Id.  After explaining the reason for the stop, Trooper Frisby asked for Oscar Estrada's driver's license.  Tr. 70.  The occupants had all of the

---

[1]        The fog line is the solid white line separating the road from the shoulder.  Tr. 107.

documents ready for Trooper Frisby's review, except for the insurance card.  Id.  In this regard, Trooper Frisby was presented with Soto's Mexican driver's license, his picture voter registration card for Mexico, Soto's international driver's license, Oscar Estrada's picture international driver's license and his picture Mexican registration card.  Id.  According to Trooper Frisby, in his experience, having all of the documents ready for his review was suspicious because generally an innocent person does not present officers with more information than requested.  Id.  Trooper Frisby also observed what appeared to be a bullet hole scar in on Soto's right elbow and a tattoo on his arm that was consistent with being a member of the Mexican Mafia.  Tr. 70-71. Trooper Frisby noted that the Maxima only had a single key in the ignition with no other keys on a key chain, which in his experience was consistent with a vehicle used to transport narcotics, and he observed a bottle of air freshener in the center console of the vehicle, which also, in his experience, is frequently used to mask the odor of controlled substances.  Tr. 71-72.

Trooper Frisby asked the driver, Oscar Estrada, to accompany him to his patrol car in order to process the traffic violation and to ensure that he was not driving while under the influence of alcohol or a controlled substance.  Tr. 72. Trooper Frisby ultimately gave Oscar Estrada a warning for an unsafe lane change related to crossing over the fog line and told him that he needed to carry with him a Mexican driver's license with him and current proof of insurance.  Tr. 74-75, 92-93.  Trooper Frisby testified that he told Oscar Estrada to wait in the squad car for a minute and then he went to speak with Soto.  Tr. 75.

Trooper Frisby approached Soto who was standing outside the vehicle and requested consent from him to search the vehicle.  Tr. 76.  According to Trooper Frisby, Soto said "okay', and he nodded in the affirmative.  Id.  Trooper Frisby asked a second time and got the same response.  Id.  Soto did not appear to Trooper Frisby to be intoxicated or mentally confused when he gave his consent to search the vehicle.  Tr. 76-77.  Trooper Frisby also testified that Soto appeared to understand what was being asked of him and that Soto appeared to understand English, based on the Trooper's previous conversation with Soto.  Tr. 77. Trooper Frisby stated that when Soto gave his consent, he was not under arrest, Soto could have walked away if he wanted to, and that he had told Soto that he was only giving Oscar Estrada a warning.  Tr. 78. However, Trooper Frisby did not tell Soto he could walk away, nor did he tell Soto that he did not have to give his consent to the search the vehicle.  Tr. 96.  In addition, Trooper Frisby testified that he did not tell Soto that he would not be placed under arrest if he did not give consent to search the vehicle.  Tr. 97.

Trooper Frisby stated that once he received consent from Soto, he proceeded to take his nationally certified narcotics detecting canine partner, Nikki, around the outside of the vehicle in a clockwise fashion, coming down the driver's side, from the front of the vehicle to the rear.  Tr. 79.  Trooper Frisby did not specifically ask Soto if he could sweep the vehicle with his canine, as part of obtaining consent to search the vehicle. Tr. 101.  Nikki made an alert for a drug odor by the driver's door.  Tr. 80.  Nikki also made a positive alert on the lower seam of the right passenger door.  Id.

Setting aside the consent provided by Soto, given the positive alerts made by his canine, Trooper Frisby testified that he felt he had probable cause to search the vehicle. Tr. 81.  Trooper Frisby then looked inside the vehicle to make sure there was nothing dangerous inside or any open containers that could spill.  Tr. 78-79.  Trooper Frisby observed no drug paraphernalia, packaging material or weapons.[2]  Tr. 94.  Trooper Frisby put Nikki into the vehicle and she detected a drug odor at the dash between the glove box and the radio console areas and also gave a positive indication towards the floor.  Id.  Upon examining the floor, Trooper Frisby located what appeared to trace amounts of marijuana.  Tr. 82.  Trooper Frisby asked Soto about the marijuana, and Soto stated that some girls had smoked marijuana in the car the previous night.  Id.

As Trooper Frisby searched the areas of the dash where Nikki had made a positive alert, he observed something unusual that was white in color sticking out of the vent between the driver's side feet and the passenger's side feet.  Tr. 83.  Trooper Frisby determined that it was going to take him more time to get into the area where the dog had indicated a positive alert and decided to the move the vehicle off of Brooklyn Boulevard because he did not think was safe.  Tr. 83.  Trooper Frisby testified that he became concerned that if they stayed where they were, they would either get hit or cause an accident.  Id.  Trooper Frisby then told Soto that he was going to move the vehicle into an adjacent car dealership lot and that defendants could leave if they wanted and come back when the officers were done with the search, or they could

---

[2]     Trooper Frisby spoke with Deputy Fry before the search regarding Trooper Frisby's observations inside of the vehicle.  Tr. 41.

wait.[3]  Id.  Soto told Trooper Frisby that he and Oscar Estrada would wait, so they sat next to the road while the Maxima was pulled into the dealership lot.  Tr. 84.

Upon continuing the search of the Maxima in the dealership lot, Trooper Frisby examined the two vents in the middle of the dash above the radio, which were removable.  Id.  Inside the vent, Trooper Frisby noticed that the plastic had been cut away with something hot.  Tr. 84.  He then reached his arm into the vent system and retrieved what he believed to be crystal methamphetamine, a handgun with rounds of ammunition in the magazine, and a white t-shirt, which was the item that he had seen earlier sticking out of the vent.  Tr. 84-85.  Trooper Frisby told Deputy Fry what he had discovered during the search of the Maxima.  Tr. 28.  After the discovery of the narcotics and handgun, Trooper Frisby placed Soto and Oscar Estrada under arrest. Tr. 85.  Approximately an hour passed from the time the vehicle was stopped and the search of the vehicle was completed.  See Govt. Ex. 2.

C.    Statement Made by Soto to Trooper Frisby

Trooper Frisby testified that he took a statement from Soto after his arrest.  Tr. 85.  According to Trooper Frisby, Soto had been placed under arrest, put in handcuffs, and was in the back of a patrol car.  Tr. 86. Trooper Frisby then retrieved Soto from the squad car and obtained some basic information from Soto and read him his Miranda rights off of a card.  Id.  Soto indicated that he understood his rights and began answering questions.  Tr. 86-87.  The statement given by Soto lasted only a few

---

[3]    According to Trooper Frisby, other than the dealership, the defendants could have gone to a restaurant that was approximately 1-2 blocks away.  Tr. 109-10.

minutes.  Tr. 87.  While Soto did not ask for attorney, he told Trooper Frisby that he did not want to answer questions.  Id. Trooper Frisby testified that he then terminated the interview.  Id.

> **D.**     **Search Warrant for the Fridley Residence**

On June 4, 2007, Deputy Fry applied for a search warrant for the Fridley residence, including a detached garage on the property.  See Govt. Ex. 3.  Anoka County Judge Thomas Hayes signed the search warrant for the residence on June 4, 2007 and the search warrant was executed on the same day.  Id.  Narcotics, gun ammunition, drug notes, digital scales, packaging materials, and identification papers were seized from the residence and the two vehicles located in the detached garage of the residence.  Id.; Tr. 30-31.

Two individuals, including defendant Juan Estrada, were arrested at the Fridley residence during the execution of the search warrant.  Tr. 30.  While no drugs were located the room where officers found Juan Estrada, the discovery of contraband at the Fridley residence provided the probable search to arrest him.  Tr. 59.  Defendant Juan Estrada subsequently gave a  Mirandized  statement to Deputy Fry, during which he admitted to being a methamphetamine user who had purchased his methamphetamine from Soto at the Fridley residence.  Tr. 37-40.

> **E.**     **Statements Made by Oscar Estrada to Deputy Fry**

Deputy Fry testified he interviewed defendant Oscar Estrada on June 5, 2007 at the Hennepin County Jail using the interpreter line provided by the Hennepin County

Jail, given that Oscar Estrada could not converse in English.  Tr. 32-33.[4]  The interview was recorded.  See Govt. Ex. 4.  Oscar Estrada was given a Miranda rights form in Spanish for him to read while Deputy Fry, through the Spanish interpreter, read him his rights.  See Transcription and Translation of Recorded Statement ("Transcript") [Docket No. 79] at 12:37.  Deputy Fry proceeded to read Oscar Estrada his Miranda rights, pausing after reading the various rights to ask Oscar Estrada if he understood these rights.  Id. at 12:53-14:11.  After he finished reading the Miranda rights to Oscar Estrada, Deputy Fry asked him, "[d]o you have any questions about any of the rights I have read to you?"  Id. at 14:12.  Oscar Estrada replied, "no", and then proceeded to ask about receiving leniency for his cooperation and answering Deputy Fry's questions.[5] Id. at 14:19-15:31.

According to Deputy Fry, Oscar Estrada understood Deputy Fry, was never physically threatened, did not appear to be under the influence of any alcohol or drugs, never requested any food or water, and the interview only lasted 30 minutes.  Tr. 35.

## II.   ANALYSIS

Defendants Soto and Oscar Estrada have challenged the validity of stop of the Maxima they were driving on June 4, 2007, and the subsequent search of the vehicle by

---

[4]    The interpreter line is a service where an interviewer can speak to the interviewee and a translator translates the words into Spanish over the speakerphone to the individual being interviewed.  Tr. 33.

[5]    This Court notes that the Government has agreed not to use any statements made Oscar Estrada at trial after he stated during his interview: "I really would prefer to have, like a lawyer that will able to help me understand this a little better because to tell the truth I'm not really knowledgeable about this stuff, I don't really know much about this."   Transcription, 28:08; see also Government's Memorandum in Response to Defendants' Motion to Suppress Evidence ("Govt.'s Mem.") at p. 10 n. 1.

Trooper Frisby.   In addition, defendants Soto, Juan Estrada, and Oscar Estrada have challenged the search of the Fridley residence, pursuant to court-issued search warrant, on the grounds that the probable cause for its issuance was based on the unconstitutional stop and search of the Maxima on June 4, 2007.   Soto also argued that the statement taken from him by Trooper Frisby should be suppressed, as it was fruit of the illegal stop and search of the vehicle.   Further, Oscar Estrada has challenged the statement he made to Deputy Fry because there was no express <u>Miranda</u> waiver made and any <u>Miranda</u> waiver given was not voluntary.

### A.   <u>Validity of the June 4, 2007 Stop of the Maxima</u>

Defendants Soto and Oscar Estrada have challenged the validity of June 4, 2007 traffic stop made by Trooper Frisby on the grounds the trooper did not have a reasonable articulable suspicion that the Maxima's drifting over the fog line constituted a violation of Minn. Stat. § 169.18, or Minn. Stat. § 169.19, subd. 4.   <u>See</u> Defendant Eduardo Soto's Memorandum is [sic] Support of Motion to Suppress Tangible Evidence and Statements of Defendant Obtained as a Result of Illegal Searches and Seizures ("Soto Mem.") at pp. 5-6; Defendant's Memorandum in Support of Pretrial Motions ("Oscar Estrada Mem.") at pp. 14-15.   Oscar Estrada argued that reliance on Minn. Stat. § 169.19 was misplaced, as the statute focuses on turning safely and signaling turns, and that there was no clear violation of Minn. Stat. § 169.18.   <u>See</u> Oscar Estrada Mem. at p. 15.   Soto asserted that Minn. Stat. §§ 169.18, subd. 7(a) and Minn. Stat. § 169.19 address the safe manner in which vehicles maneuver in lanes, that the Maxima was not being operated in an unsafe manner in this case, and that these statutes do not make

drifting over the fog line illegal.  <u>See</u> Soto Mem. at p. 6.  The Government countered

that Trooper Frisby had probable cause to stop the Maxima for drifting over the fog line

in violation of Minn. Stat. §§ 169.19 and that the Eighth Circuit has upheld the crossing

of a fog line as a proper basis for a traffic stop.  <u>See</u> Govt.'s Mem. at pp. 17-18.

The Fourth Amendment guarantees "the right of the people to be secure in their

persons, houses, papers, and effects, against unreasonable searches and seizures,

shall not be violated."  "It is well established that a roadside traffic stop is a 'seizure'

within the meaning of the Fourth Amendment."  <u>United States v. Jones</u>, 269 F.3d. 919,

924 (8th Cir. 2001).  However, "a traffic violation – however minor – creates probable

cause to stop the driver of a vehicle."  <u>United States v. Linkous</u>, 285 F.3d 716, 719 (8th

Cir. 2002) (citations omitted).  This is true even if a valid traffic stop is a pretext for

another investigation.  <u>Id.</u> (citation omitted).  Thus, even assuming that the real reason

for the traffic stop was because the DEA believed that the vehicle was carrying drugs,

Trooper Frisby's actual motive in stopping the Maxima is irrelevant so long as the stop

was valid.  <u>See</u> <u>Whren v. United States</u>, 517 U.S. 806, 810, 812-13 (1996).

Here, Trooper Frisby testified that he observed the Maxima drift over the right fog

line with both passenger side tires, while it was exiting down the Brooklyn Boulevard

ramp.  Tr.  65, 99, 107.  Under Minnesota law, a "vehicle shall be driven as nearly as

practicable entirely within a single lane . . . ."  Minn. Stat. § 169.18, subd. 7(a).

Minnesota state courts have concluded that crossing the centerline or a fog line is a

violation of the traffic laws under Minn. Stat. § 169.18, subd. 7(a), and provide an officer

with a reasonable basis to stop a vehicle.  <u>See</u> <u>State v. Bishop</u>, No. CX-01-912, 2001

WL 1530897 at *2 (Minn. Ct. App. Dec. 04, 2001); see also Peters v. Commissioner of Public Safety, No. C0-98-2141, 1999 WL 486848 at *2 (Minn. Ct. App. July 13, 1999) (vehicle crossing over the fog twice supported the officer's stop of the vehicle as a violation of Minn. Stat. § 169.18, subd. 7(a)).   Further, any argument by defendants that there was no traffic violation because drifting over the fog line did not place other vehicles in danger is unsupported by Minnesota law, where Minnesota courts have found that a driver need not place others in danger to commit a traffic violation.   See State v. Bissonette, 445 N.W.2d 843, 846 (Minn. Ct. App. 1989); Gerding v. Comm'r of Pub. Safety, 628 N.W.2d 197, 200-01 (Minn. 2001) (concluding driving with an object in the rear view mirror is a traffic offense that supports a stop even if that object does not obstruct the driver's vision).

The driving conduct in this case is analogous to that addressed in United States v. Pullman, 265 F.3d 736 (8th Cir. 2001), where the Eighth Circuit concluded that an officer had probable cause to conduct a stop of a vehicle that had drifted over the fog line in violation of Ark. Code Ann. § 27-51-302, which provides that "[a] vehicle shall be driven as nearly as practicable entirely within a single lane . . . ."  265 F.3d at 739; see also United States v. Herrera Martinez, 354 F.3d 932, 933-34 (8th Cir. 2004) (per curium) (concluding that single incident of crossing the fog line in violation of a South Dakota statute requiring the driver to stay "as nearly as practicable" within one traffic lane provided the trooper sufficient probable cause to stop the vehicle), judgment vacated on other grounds by Martinez v. United States, 127 S.Ct. 1125 (2007). Because the Maxima crossed the fog line in violation of Minn. Stat. § 169.18, subd. 7(a),

16

this Court finds that Trooper Frisby had probable cause to stop the vehicle based on the traffic violation.

Furthermore, this Court concludes that Trooper Frisby had probable cause to stop the Maxima when it crossed over the fog line in violation of Minn. Stat. § 169.19, subd. 4.  This statute provides in relevant part:

> Change of course. No person shall turn a vehicle at an intersection unless the vehicle is in proper position upon the roadway as required in this section, or turn a vehicle to enter a private road or driveway <u>or otherwise turn a vehicle from a direct course or move right or left upon a highway unless and until the movement can be made with reasonable safety after giving an appropriate signal in the manner hereinafter provided</u>.

Minn. Stat. § 169.19, subd. 4 (emphasis added).

Given that Trooper Frisby observed the Maxima cross over the right fog line with both passenger tires, without giving an appropriate signal, in violation of Minn. Stat. § 169.19, subd. 4, this Court finds that Trooper Frisby had probable cause to stop the vehicle.

For all these reasons, this Court finds that Trooper Frisby had probable cause to stop the Maxima on June 4, 2007 based on his observation of a traffic violation under Minnesota law.[6]

---

[6]    The Government also argued that the stop of the Maxima was constitutionally valid due to the fact that that Trooper Frisby had a reasonable and articulable suspicion that criminal activity was afoot based on Deputy Fry's knowledge of the ongoing surveillance and investigation.   <u>See</u> Govt.'s Mem. at pp. 20-21. It is true that an investigatory stop is exempt from the Fourth Amendment's requirements that a seizure of a person be made pursuant to a warrant or predicated on probable cause.   <u>See</u> <u>United States v. Ortiz-Monroy</u>, 332 F.3d 525, 528 (8th Cir. 2003) (citing <u>Terry v. Ohio</u>, 392 U.S. 1, 21-22 (1968)).  "A <u>Terry</u> investigatory stop allows an officer briefly to detain

a citizen if the officer has reasonable suspicion that 'criminal activity may be afoot.'" Ortiz-Monroy, 332 F.3d at 528 (quoting Terry, 392 U.S. at 30); see also United States v. Johnson, 326 F.3d 1018, 1022 (8th Cir. 2003) (citation omitted) ("[A] law enforcement officer may stop and briefly question an individual if the officer has a reasonable suspicion that the person has committed or is about to commit a crime."). Here, the only testimony regarding Trooper Frisby's reasonable suspicion was the following exchange:

> BY MR. WINTER:
>
> Q.  Did you – jumping back to the point in time where you had talked to the State Patrol about doing a stop on the Maxima, are you with me?
>
> A.  Yes.
>
> Q.  Okay.  At that point in time you didn't believe you had probable cause to do a full arrest of those occupants of the car; is that correct?
>
> A.  That's correct.
>
> * * *
>
> Q:   Did you feel you had a reasonable suspicion, however, that they were engaged in criminal activity?
>
> A.   Yes.
>
> MR. WINTER:      I have nothing else.

Tr. 61.

However, Trooper Frisby did not provide the Court with any specific and articulable facts which led him to believe that criminal activity was afoot.  Moreover, while the Government asserted that Deputy Fry's knowledge of the ongoing surveillance and investigation, combined with Trooper Frisby's observation of the traffic stop, provided a reasonable and articulable suspicion to stop the vehicle (Govt. Mem. at pp. 20-21), Trooper Frisby stated that he did not speak to Deputy Fry prior to the stop and was advised by Dispatch that he would have to find his own legal reason to stop and search the vehicle.   Tr. 64, 88.   In fact, Deputy Fry testified he did not want his investigation revealed if the stop was not based on the officer's probable cause.  Tr. 41-42.  In other words, there is no evidence before the Court to support the Government's

18

**B.     Validity of the June 4, 2007 Search of the Nissan Maxima**

Defendants argued that the consent given by Oscar Estrada to Trooper Frisby the search the Maxima was neither knowing or voluntary and that if consent was given, Trooper Frisby exceeded that consent by allowing a canine sniff and by moving the vehicle.  See Soto Mem. at pp. 9-10; Oscar Estrada Mem. at pp. 16-17.  The Government countered that Trooper Frisby had probable cause to search the vehicle based on the canine alert of the exterior of the Maxima.  See Govt.'s Mem. at pp. 21-24. Further, the Government argued that the search of the Maxima was valid based on the knowing and voluntary general consent given to Trooper Frisby by Soto.  Id. at pp. 24-30.

**1.     Knowing and Voluntary Consent**

A warrantless search does not violate the Fourth Amendment when law enforcement officers obtain voluntary consent from the individual whose property is searched or from a third party with common authority over the property.  Illinois v. Rodriguez, 497 U.S. 177, 181 (1990).  The Government bears the burden of proving, by preponderance of the evidence, that the Soto's consent to the search was given freely and without coercion.  See United States v. Smith, 260 F.3d 922, 924 (8th Cir. 2001). An inquiry into the voluntariness of consent "turns on the totality of the circumstances, which must demonstrate that the police reasonably believed the search to be consensual."  United States v. Zamoran-Coronel, 231 F.3d 466, 469 (8th Cir. 2000). The actual subjective state of mind at the time a defendant gave his consent is not

---

argument that Trooper Frisby stopped the Maxima based on suspicion that criminal activity was afoot.

determinative; "our focus, rather, is on how a reasonable person could have perceived his state of mind at that time."  United States v. Cedano-Medina, 366 F.3d 682, 685 (8th Cir. 2004).

Whether consent was voluntary is an issue of fact determined by considering both the encounter and the nature of the person consenting, under the totality of the circumstances. See United States v. Chaidez, 906 F.2d 377, 381-82 (8th Cir. 1990).  In assessing the context of the encounter, courts consider whether the individual:  (1) was detained and questioned for a long or short period of time;  (2) was threatened, physically intimidated, or punished by the police; (3) relied on misrepresentations or promises made by the police;  (4) was in custody or under arrest when he or she consented;  (5) was in a public or secluded place; and (6) objected to the search or stood by silently when the search occurred.  See Chaidez, 906 F.2d at 381; see also Zamoran-Coronel, 231 F.3d at 469-70.

As to the nature of the consenting person, courts consider the following factors: (1) the individual's age; (2) the individual's general intelligence and education; (3) whether the individual was intoxicated or under the influence of drugs at the time of the consent; (4) whether the individual consented after they were given a Miranda warning or were told that they had the right to withhold consent; and (5) whether the individual was aware of the legal system and its protections from previous arrests.  See Chaidez, 906 F.2d at 381.

Based on the totality of circumstances, the Court concludes that Soto's consent to search his vehicle was voluntary.  First, as to Soto's characteristics, these factors

support the Court's conclusion that his consent to the search the vehicle was voluntary. The record shows that Soto is an adult of average intelligence given his ability to understand what was going on and engage Trooper Frisby in a conversation.  See Govt. Ex. 2 (DEA Traffic Stop Video); Tr. 77.   Trooper Frisby also testified that defendant did not appear intoxicated or mentally confused when he consented to the search.  Tr. 76-77.  No promises were made to Soto in order to obtain his consent; he was standing out in public on a sidewalk; he was not in handcuffs; and he had been told by Trooper Frisby that Oscar Estrada was only getting a warning for crossing the fog line at the time he was asked for and gave his consent to search the car.  Tr. 77-78. While Trooper Frisby did not tell Soto that he did not have to consent to the search of the vehicle (Tr. 96) and there is no indication in the record as to whether Soto had previous experience with law enforcement, the record does reflect that Trooper Frisby asked Soto twice if he would consent to a search the car, and Soto replied, "ok."  See Govt. Ex. 2 (12:20); Tr. 46.  This Court finds that this inquiry sufficiently communicated to Soto that his consent was voluntary, and that he did not have to agree to Trooper Frisby's request.  See United States v. Alcantar, 271 F.3d 731, 737 (8th Cir. 2001) ("Although Alcantar was not advised of his right to refuse consent, that is not in and of itself sufficient to find that consent was not voluntarily given.") (citation omitted).  In sum, an evaluation of Soto's characteristics supports this Court's conclusion that Soto's consent to search the vehicle was voluntary.

Second, as to the context of the encounter, all of the factors support the conclusion that Soto's consent to the search was voluntary.  Defendants argued that

because their car had been stopped by police, Oscar Estrada had been placed in the squad car, and there were multiple troopers on scene, this constituted a coercive environment, where Soto could not feel free to withhold his consent to search the Maxima. <u>See</u> Oscar Estrada Mem. at p. 16; Soto Mem. at p. 9-10.[7]  An examination of the records establishes that Soto was never detained and the stop had only lasted approximately 19 minutes prior Trooper Frisby asking for consent. <u>See</u> Govt. Ex. 2 (The vehicle was pulled over at approximately 12:01 and consent was asked for at approximately 12:20).[8]  Soto, as the passenger of the vehicle had not violated any law, and according to Trooper Frisby was free to go. Tr. 78.  Prior to asking for consent to search the car, Soto was told by Trooper Frisby that Oscar Estrada was only given a warning for the traffic violation (<u>id.</u>; <u>see</u> <u>also</u> Govt Ex. 2), which supports a finding that reasonable person would have felt that he would be allowed to leave the presence of the police without much delay. In addition, during the entire encounter with the police, Soto was never placed under arrest, threatened, physically intimidated or punished, and the police did not promise him anything or make any misrepresentations to him.[9]

---

[7]    This Court observes that such a finding would render most consents to search as unconstitutionally invalid, given that all traffic stops involve one or more law enforcement officers coming into contact with an individual, who may or may not be placed in a squad car.

[8]    This Court notes that the stop for the purposes of the traffic violation ended at approximately at 12:19:30, after Trooper Frisby had explained to Oscar Estrada that he was only getting a warning, and after Soto had been notified of the same. <u>See</u> Govt. Ex. 2.  This Court notes that the approximately 18 and 1/2 minutes needed for the traffic stop was not excessive given the language barrier between Trooper Frisby and Oscar Estrada and the amount of documentation provided to Trooper Frisby.

[9]    According to Oscar Estrada, Trooper Frisby asked several intimidating questions prior to receiving consent to search the vehicle. <u>See</u> Oscar Estrada Mem. at p. 16.

Finally, Soto was standing in public place when he gave his consent to search, and he never objected at any time or otherwise revoked his consent to the search, even when the dog was used to sniff around and inside his vehicle.

Based on the totality of the circumstances, this Court finds that Soto's consent to the search of his vehicle was voluntary and knowing, and that Trooper Frisby had no reason to believe otherwise. The fact that Soto was not explicitly told he could refuse to give consent to search the car is not a basis for suppression of the evidence recovered during the search of the Maxima.

### 2.   Scope of Consent

The scope of a consensual search is measured by what "the typical reasonable person [would] have understood by the exchange between the officer and the suspect." Florida v. Jimeno, 500 U.S. 248, 251 (1991); see also United States v. Ferrer-Montoya, 483 F.3d 565, 568 (8th Cir. 2007). "The scope of a search is generally defined by its expressed object." Jimeno, 500 U.S. at 251. Given this standard, the Eighth Circuit has

---

This Court notes that there is a question as to whether Oscar Estrada even has standing to challenge the consent given by Soto to search Soto's vehicle. See United States v. Green, No. CRIM.05-207, 2006 WL 62820 at *5 (W.D. Pa. 2006. Jan. 11, 2006) ("defendant has no standing to challenge the search, as he did not own the vehicle that he was driving and he has advanced no reasonable expectation of privacy therein.") (citing United States v. Schofield, 80 Fed.Appx. 798, 802 (3rd Cir. 2003) (when owner of vehicle is traveling with non-owner driver, the latter has no reasonable expectation of privacy in vehicle)); see also Colarte v. Leblanc, 40 F. Supp.2d 816, 820 (E.D. La. 1999) (concluding that while the driver of the a vehicle stopped by police did have standing to challenge the stop, he did not have standing to challenged the search of the vehicle, as the passenger and owner of the vehicle gave police consent to search the vehicle) (citations omitted). Regardless, this Court does not find that Trooper Frisby's questions regarding scars and possible gang tattoos on Soto's body or regarding guns or drugs in the vehicle, to be so intimidating as to render Soto's consent involuntary.

concluded that an "officer may reasonably interpret a suspect's unqualified consent to search a vehicle for drugs to include consent to, inter alia: 'search containers within that car which might bear drugs,'; probe underneath the vehicle; and open compartments that appear to be false, or puncture such compartments in a minimally intrusive manner." Ferrer-Montoya, 483 F.3d at 568 (internal citations omitted).

In the present case, Soto placed no qualifications or limitations upon his consent to Trooper Frisby's search of the vehicle.  Given the minimally intrusive nature of a dog search of a vehicle, this Court finds that the dog sniff of the exterior Soto's vehicle did not exceed the scope of the consent to search the Maxima any more than opening compartments that appear to be false, or puncturing such compartments.  See generally, United States v. Place, 462 U.S. 696, 706-09 (1983) (characterizing the use of drug-sniffing dog as a minimally intrusive means of investigating); see also United States v. Rodriguez-Preciado, 399 F.3d 1118, 1131 (9th Cir. 2005) ("In addition, the search of the van with a drug-sniffing dog was within the scope of Rodriguez-Preciado's consent.").  Further, once the dog alerted to the presence of drugs during the search of the vehicle's exterior, Trooper Frisby had probable cause to proceed with a search of the interior of the vehicle, even without Soto's consent.  See United States v. Alexander, 448 F.3d 1014, 1017 (8th Cir. 2006) ("[D]og's identification of drugs in Alexander's car provided probable cause that drugs were present, which entitled the officers to search the vehicle forthwith pursuant to the automobile exception to the warrant requirement."); see also United States v. Bloomfield, 40 F.3d 910, 919 (8th Cir. 1994); ("A dog's

identification of drugs in luggage or in a car provides probable cause that drugs are present.").

In addition, this Court concludes that moving the vehicle from Brooklyn Boulevard to the adjacent car lot did not exceed the consent given by Soto, as moving a vehicle to a safer location to complete the search was within that inherent consent.   Trooper Frisby testified that he became concerned that if they stayed where they were on Brooklyn Boulevard that they would either get hit or cause a "gawker" accident.  Tr. 83; see also Govt. Ex. 2 (12:34-where Trooper Frisby communicates his concerns about the traffic).  The videotape recording of the stop shows that Oscar Estrada stopped the vehicle in the right lane of southbound Brooklyn Boulevard.  See Govt. Ex. 2.  The video also showed that there was a high volume of traffic on Brooklyn Boulevard.[10]  Id.  The evidence supports Trooper Frisby's contention that the vehicle needed to be moved out of traffic in order protect the officers, defendants, and the public from a possible accident.

Moreover, there is no evidence in the record demonstrating that Soto objected to or suggested that he wished to withdraw his consent to the search the vehicle when a canine was going to be used to explore the vehicle or when the vehicle was going to be moved.   See Ferrer-Montoya, 483 F.3d at 568 (concluding that the fact that the defendant did not object or withdraw his general consent when a particular search was being conducted, supported a finding that the specific search was with the general

---

[10]    The vehicle was moved no more than 20 yards away from Soto and he had a clear view of the vehicle.  Tr. 84.

consent given).   Therefore, for all the above reasons, this Court does not find that Trooper Frisby exceeded the scope of Soto's general consent to search the vehicle.[11]

In summary, given that contraband seized from the vehicle was obtained by virtue of a lawful stop and search, this Court recommends that defendants Soto and Oscar Estrada's motion to suppress the evidence seized from the vehicle be denied.   In addition, as all three defendants' motions to suppress evidence seized at the Fridley residence pursuant to a court-issued search warrant, were premised on the contention that the probable cause for the warrant's issuance was based on the unconstitutional stop and search of the Maxima, this Court recommends that these motions should be denied given this Court's conclusion that the stop and search of the Maxima were valid.

## C.      Statement Made by Oscar Estrada[12]

Oscar Estrada moved to suppress the statement he made to Deputy Fry on several grounds.   First, he claimed that he never "specifically" waived his Miranda rights.   See Oscar Estrada Mem. at p. 13.   In support of this contention, Oscar Estrada he alleged that his waiver of his Miranda rights were neither knowing nor intelligent as

---

[11]     Given that this Court has concluded that voluntary consent was given to search the Maxima, the Court will not address the Government's alternative contention that Trooper Frisby did not need Soto's consent to search the exterior of the Maxima with the canine.   Given the dog sniff of the exterior occurred after the traffic violation had been addressed (i.e., Trooper Frisby decided to give Oscar Estrada a warning), it is not clear that the subsequent search using the canine was only a de minimis intrusion on the defendants' Fourth Amendment rights.   See United States v. Alexander, 448 F.3d 1014, 1016-17 (8th Cir. 2006).

[12]     Oscar Estrada's motion to suppress statements made by him after he requested an attorney (at 28:08 of the Transcription) should be denied as moot, given the Government's representation that they will not use these statements at trial.   See Govt.'s Mem. at p. 10 n. 1, supra.

evidenced by the colloquy between Deputy Fry and himself immediately after Deputy Fry gave him the Miranda warning.  According to Oscar Estrada, Deputy Fry asked him if he had any questions regarding his rights, then he asked a question which showed that he was confused about and misunderstood his rights.  Id. at pp. 5, 13-14.  Second, Oscar Estrada asserted that the statement he gave to Deputy Fry was the product of pre-Miranda and post-Miranda threats, strong language, subtle promises of leniency, and lies, and as such, was not voluntary.  Id at pp. 4-7, 12-13.  In particular, Oscar Estrada pointed to the statements made by Deputy Fry to him about going to prison, promises of leniency if Oscar Estrada cooperated, and representations that Soto had given a statement and was cooperating, when he had not.  Id.  Third, Oscar Estrada asserted that prior to issuing the Miranda warning, Deputy Fry improperly asked questions and elicited information from him regarding his family and ties to Soto, which information was then used against him during his Mirandized statement to coerce a confession.  Id. at pp. 4-5, 14.

### 1.   Specific Waiver of Miranda Rights

This Court first addresses Oscar Estrada's argument that his statement should be suppressed because he never "specifically" waived his Miranda rights.  See Oscar Estrada Mem. at p. 13.  In opposition, the Government asserted that there is no requirement that a waiver of Miranda be expressly made.  See Govt. Mem. at pp. 36-37.

The Constitution, does not require that officers obtain an affirmative answer to a question such as "do you waive these rights" in order to find waiver of Miranda rights.  See North Carolina v. Butler, 441 U.S. 369, 373 (1979).  Instead, a Miranda waiver may

be implied from the totality of the circumstances.  Id. at 373-76.  Further, a defendant's

willingness to answer questions after acknowledging his Miranda rights is sufficient to

constitute an implied waiver.  See Burket v. Angelone, 208 F.3d 172, 198 (4th Cir.

2000), cert. denied 530 U.S. 1283 (2000); see also United States v. Mandujano, No.

CR. 03-178(2) (JRT/FLN), 2003 WL 22076577 at *4 (D. Minn. Aug. 22, 2003) ("Waiver

can be inferred by conduct, and a willingness to answer questions after acknowledging

Miranda rights is sufficient to constitute an implied waiver.") (citations omitted).

　　　In this case, Oscar Estrada was given a Miranda rights form in Spanish for him to

read while Deputy Fry, through a Spanish interpreter, read him his rights.   See

Transcript at 12:37.  Deputy Fry proceeded to read Oscar Estrada his rights under

Miranda, pausing after reading each of the various rights to ask Oscar Estrada if he

understood that right, to which Oscar Estrada answered "okay", "yes" or "that's fine." Id.

at 12:53-14:11.  After he finished reading the Miranda rights to Oscar Estrada, Deputy

Fry asked him, "[d]o you have any questions about any of the rights I have read to you?"

Id. at 14:12.  Oscar Estrada replied, "no", and than proceeded to ask about receiving

leniency for cooperation and answering Deputy Fry's questions.[13]  Id. at 14:19-15:31.  In

---

[13]　　This Court finds no merit to Oscar Estrada's contention that his understanding of
the Miranda warning should have been clarified by Deputy Fry after he immediately
asked Deputy Fry a question regarding leniency.  First, the record establishes that
Oscar Estrada replied "no" when Deputy Fry asked him if he had questions regarding
his Miranda rights.  Second, the record reflects that just prior to reading Oscar Estrada
the Miranda rights, Deputy Fry had informed him that he was looking at a minimum of
15 years of prison, depending upon his cooperation, and Oscar Estrada had expressed
an interest in hearing what the officers had to tell him.  See Transcript, 12:24.  Thus,
Oscar Estrada's question about leniency for his cooperation following the administration
of the Miranda warning to him was the natural follow-up to the comment he had made to
the officers just before the rights were read to him.  In other words, it is clear from the

addition, Oscar Estrada proceeded to converse and answer Deputy Fry's questions, after reading and acknowledging his <u>Miranda</u> rights.  Based on all of Oscar Estrada's statements and conduct, this Court finds that these actions constituted an implied waiver of his <u>Miranda</u> rights.

2.   <u>Knowing and Voluntary Waiver of Miranda Rights</u>

Under <u>Miranda</u>, an individual must be advised of his or her right to be free from compulsory self-incrimination and the right to the assistance of an attorney any time the individual is taken into custody for questioning.  <u>See</u> <u>Miranda v. Arizona</u>, 384 U.S. 436, 444 (1966); <u>see</u> <u>also</u> <u>United States v. Griffin</u>, 922 F.2d 1343, 1347 (8th Cir. 1990). Once warned, a suspect may waive his <u>Miranda</u> rights if he knowingly and voluntarily waives those rights.  <u>See</u> <u>United States v. Bell</u>, 477 F.3d 607, 612 (8th Cir. 2007).

A waiver is "knowing" where it is made with full understanding of the nature of the right being abandoned and the resulting consequences of abandoning the right.  <u>Bell</u>, 477 F.3d at 612 (citing <u>Thai v. Mapes</u>, 412 F.3d 970, 977 (8th Cir. 2005)).  This Court concludes that Oscar Estrada made a knowing and intelligent waiver of his rights.  As discussed above, after reading and being read each right separately in his native language, Oscar Estrada indicated he understood the right, and at the end of the reading, stated he had no questions about any of the rights.  He then proceeded to ask and answer questions of Deputy Fry.  There is nothing in the record before this Court to suggest that Oscar Estrada was confused or misunderstood his rights or what he was giving up by proceeding to speak with officers.

---

record that Oscar Estrada had no confusion regarding his <u>Miranda</u> rights before he asked about what he could do for leniency.  <u>See</u> Transcript, 14:19.

"In considering whether a [statement] was voluntary, the determinative question is whether the [statement] was extracted by threats, violence, or promises (express or implied), such that the defendant's will was overborne and his or her capacity for self-determination was critically impaired." United States v. Pierce, 152 F.3d 808, 812 (8th Cir. 1998) (citing Sumpter v. Nix, 863 F.2d 563, 565 (8th Cir. 1988) (citation omitted)). This analysis requires courts to assess "the conduct of law enforcement officials and the suspect's capacity to resist any pressure." Id. (citing United States v. Meirovitz, 918 F.2d 1376, 1379 (8th Cir. 1990) cert. denied, 502 U.S. 829 (1991)); see also Dickerson v. United States, 530 U.S. 428, 434 (2000) (citation omitted).

Further, "[a]lthough a promise made by law enforcement is a relevant consideration in assessing police conduct, it is only one circumstance to be considered and does not render a confession involuntary per se." Simmons v. Bowersox, 235 F.3d 1124, 1133 (8th Cir. 2001) (citing United States v. Larry, 126 F.3d 1077, 1079 (8th Cir. 1997); United States v. Kilgore, 58 F.3d 350, 353 (8th Cir. 1995) (indicating that even if the suspect had been promised some form of leniency, this circumstance alone would not render his confession involuntary)); see also United States v. LeBrun, 363 F.3d 715, 725 (8th Cir. 2004) (finding that a promise made by law enforcement does not render a confession involuntary per se) (citations omitted).

Relevant factors to the assessment of voluntariness include the accused's age, education, intelligence, advice of constitutional rights, the length of the detention and questioning, and psychological impact. See Schneckloth v. Bustamonte, 412 U.S. 218, 226 (1973). "The government bears the burden of proving by a preponderance of the

30

evidence that the defendant knowingly and voluntarily waived this right." United States v. Barahona, 990 F.2d 412, 418 (8th Cir. 1993) (citing Colorado v. Connelly, 479 U.S. 157, 168 (1986); United States v. Dougherty, 810 F.2d 763, 773 (8th Cir. 1987)).

Here, Oscar Estrada asserts that his waiver was not voluntary because prior to and after receiving the Miranda warning, he was threatened with prison time, promised leniency for cooperation, subjected to strong language during the interview, and told by Deputy Fry that Soto had already given a statement implicating him, when in fact, Soto had not given any statement.

a.      Threats and Promises of Leniency

Oscar Estrada has challenged the interview he gave to Deputy Fry because it was the product of pre-Miranda threats and promises.   The first statements at issue pertain to Deputy Fry informing Oscar Estrada that based on what was found in the Maxima, he was looking at a minimum of 15 years in federal prison, depending on his cooperation.   The dialogue between Deputy Fry and Oscar Estrada before he was administered the Miranda warning was as follows:

> MV1[14]: Okay.  Being that said, based on what was found in the vehicle, I have enough to charge you on a federal narcotics crime, which means a minimum of fifteen years in prison.
>
> INT:   *(Very well). Sir, with that said, I, we have the idea that its enough burden [sic], do everything to you, press federal, federal charges that can lock them up with at least 15 years in jail.  All right?*

---

[14]      "MV1" references Deputy Fry; "MV2" references Tony, a state law enforcement officer; "INT" references the interpreter; "EST" references Oscar Estrada; "U/I" refers to unintelligible or inaudible.  No definition was given for "TN."  See Transcript at p.1.

EST:  *Uh-huh.*

MV1:   I'm gonna emphasize that again, okay, this is a minimum federal standard, okay, fifteen years minimum standard, okay?   This isn't state level.   [U/I] there was enough drugs in the car with the gun that you're looking at fifteen minimum in a federal prison.

INT:  *Listen sir, I want to reiterate it to you, this isn't, this is the minimum that is added [TN: "added" mispronounced/improperly conjugated], uh fifteen years in jail.  Here there's enough evidence in the vehicle along with the wea-, with the weapon, to lock you up with, at least 15 years.*

EST:  *Uh-huh.*

\* \* \*

MV1:   [U/I]? With the drugs and the gun, it's not gonna go away and neither are the charges, okay?  I am hear to speak with you Oscar, to find out what is going on with the drugs and the gun.

INT:  *Very well. With respect to the drugs and the weapon, that it's not going to disappear, that's not going to go anywhere.  Un, I'm coming now to listen to your testimony of the, of the story.*

EST:  *Okay, that's fine.*

\* \* \*

MV1:   I want to emphasize that this moment in time right here is probably the most important period of time in his life, okay?  He is looking at fifteen years minimum federal prison and, depending on how he cooperates depends on what happens from there.

INT:  *Very well sir, and I want to let you know that this moment may perhaps be the most important moment in your life.  Depending on how you work with us, it could [U/I] depend on how everything turns out, all of this, how all of this would end.*

> EST: Well. it depends, I also want to listen to, to, to what they say to me.

Transcript, 3:17-4:32, 5:41-6:12,11:42-12:24 (emphasis in original).

Subsequent to this dialogue, Deputy Fry gave Oscar Estrada his <u>Miranda</u> rights.

Transcript, 12:37-14:09.  The following exchange then took place once Deputy Fry had

finished with <u>Miranda</u>:

> MV1:  D'you, d'you have any questions about any of the rights I've read you?
>
> INT:  *Eh, do have any questions about the rights I have read to you?*
>
> EST:  *No, but, I want to hear what my chances are or something to see what I can do.*
>
> INT:  No.  I just wanna know um, I wanna hear the possibilities [U/I].
>
> MV1:  I cannot guarantee you, uh, deals as far as time off from a federal charge, okay?  What I can do is I can take the information you provide me and I can say, "Hey, hey Oscar's cooperating.  He does not want to spend time in, in prison, uh, can you give him a break?"  I'm the middleman.
>
> INT:  *Very well, we won't be able to guarantee something, for example time, uh, to reduce your time, of the charges. The only things I could do is give the word, uh to tell them, "Look if Oscar, he, Oscar doesn't want to be in jail, he wants, he wants to be free.  He, he is helping."  I mean, I am like the middleman to help.*

<u>Id.</u>, 14:12-15:22.  In addition, during his interview, Oscar Estrada was reminded again

that he was facing substantial prison time, depending on his cooperation, and he was

told not to lie, that the officers would leave if he continued to lie, and that he would lose

33

the opportunity to help himself if he kept lying.  Id., 16:48-17:33, 21:13-40, 21:56-23:57, 25:18-26:52.

Coercive police activity is a necessary predicate to the finding that a statement was made involuntarily.  Colorado v. Connelly, 479 U.S. 157, 167 (1986).  "In making this determination, courts look at the totality of the circumstances, including the conduct of the law enforcement officials and the defendant's capacity to resist any pressure."  Pierce, 152 F.3d at 812 (citing United States v. Meirovitz, 918 F.2d 1376, 1379 (8th Cir.1990), cert. denied, 502 U.S. 829 (1991)).

The Court finds that the tactics used by Deputy Fry prior to and during his interview of Oscar Estrada were not coercive.  First, although Deputy Fry told Oscar Estrada that he was being charged with a federal narcotics crime that would not go away and was looking at "fifteen years minimum federal prison" time, '"[a] truthful and noncoercive statement of the possible penalties which an accused faces may be given to the accused without overbearing one's free will. . . .'"  Simmons, 235 F.3d at 1133 (quoting United States v. Ballard, 586 F.2d 1060, 1063 (5th Cir. 1978)); see also United States v. Gallardo-Marquez, 253 F.3d 1121, 1123 (8th Cir. 2001) (upholding statements as voluntary because the conduct of the police officers was not calculated to overbear defendant's will where the officers told defendant he would receive a life sentence when the sentence was for 32 years).  Deputy Fry's statement that Oscar Estrada was looking at "fifteen years minimum federal prison" time was a truthful statement of a possible penalty for his actions, and the Court does not find that it constitutes coercive police activity.

Second, "[a]lthough a promise made by law enforcement is a relevant consideration in assessing police conduct, it is only one circumstance to be considered and does not render a confession involuntary per se."  Simmons, 235 F.3d at 1133 (citing United States v. Larry, 126 F.3d 1077, 1079 (8th Cir. 1997); Kilgore, 58 F.3d at 353) (indicating that even if the suspect had been promised some form of leniency, this circumstance alone would not render his confession involuntary)); see also United States v. LeBrun, 363 F.3d 715, 725 (8th Cir. 2004) (finding that a promise made by law enforcement does not render a confession involuntary per se) (citations omitted).  Here, Deputy Fry promised Oscar Estrada nothing.  At most, Deputy Fry told Oscar Estrada that he would make sure that the charging attorneys would know that Oscar Estrada had helped, and that if a person is honest, he helps himself by telling the truth.  See e g. Transcript, 23:11-27, 25:18-26:52.  In fact, Deputy Fry told Oscar Estrada that he could not guarantee that he could get time off for Oscar Estrada if he cooperated, (id., 14:35-57, 25:18-26:45), and Oscar Estrada's belief to the contrary is irrelevant.  See generally LeBrun, 363 F.3d at 725 (citations omitted) (finding that a mistaken belief of promised leniency would not render confession involuntary).

Third, the fact that Oscar Estrada was read his Miranda rights weighs in favor of a voluntariness finding.  See United States v. Otters, 197 F.3d 316, 318 (8th Cir. 1999) (citations omitted) (finding that a reading of  Miranda weighs in favor of a finding of voluntariness where promises of leniency have been made to a defendant).

b.      Misrepresentations Regarding Soto

Oscar Estrada also argued that before reading him the Miranda warning Deputy

Fry improperly reminded him that Soto had already been interviewed and had

implicated him.  See Oscar Estrada Mem. at pp. 3, 13.

Deputy Fry represented to Oscar Estrada that he had just spoken with Soto prior

to talking with him and that he wanted to get Oscar Estrada's side of the story.  See

Transcript, 4:35-4:51.  Deputy Fry also told Oscar Estrada:

> MV1: Now, obviously, your friend does not want to go to
> prison for the drugs and the gun, okay.  So, he gonna, he's
> gonna tell me one side of the story.  I am here to get your
> side of the story.
>
> INT:  *Very well, obviously, your friend Eduardo doesn't want
> to go to prison.  He already told me a part, or a side of the
> story [TN: see note re: "side of the story," above].  I come
> now to listen to your side of the story.*

Id., 5:08-5:24.

Additionally, just prior to giving Oscar Estrada his Miranda warning, Deputy Fry

stated:

> MV1: Okay.  Like I said, I spoke to your cousin Eduardo,
> okay?  He already talked about the incident, all right?  Now I
> want you to talk to me regarding the traffic stop, but before I
> do so I wanna read you your rights.
>
> INT:  Very well sir, and as I mentioned to you, I have already
> spoken with you friend Eduardo about what has happened.
> Now we want to listen to your part of the story, your
> testimony about this.

Id., 11:04-11:22.

There is no evidence before the Court that Deputy Fry ever took a statement from Soto.  It is true that Soto gave a <u>Mirandized</u> statement to Trooper Frisby on June 4, 2005; however, the statement given by Soto lasted only a few minutes and he refused to answer Trooper Frisby's answer questions.  Tr. 87; <u>See</u> Govt. Ex. 3 (Audio of Soto Statement to Trooper Frisby).   Trooper Frisby testified that he then terminated the interview.  <u>Id.</u>  In short, the record before the Court suggests that Deputy Fry lied to Oscar Estrada when he told him that he had just spoken with Soto and gotten his side of the story.

The United States Supreme Court has found that a <u>Miranda</u> waiver must have been voluntary "in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion or deception."  <u>Moran v. Burbine</u>, 475 U.S. 412, 421 (1986); <u>see</u> <u>also</u> <u>United States v. Turner</u>, 157 F.3d 552, 555 (8th Cir. 1998).  However, the Supreme Court has also concluded that lies told by law enforcement officers do not necessarily make a confession involuntary; instead, this is just one factor to consider out of the totality of the circumstances.  <u>Frazier v. Cupp</u>, 394 U.S. 731, 739 (1969) (citation omitted).  Similarly, in <u>United States v. Petary</u>, 857 F.2d 458 (8th Cir. 1988), the Eighth Circuit dealt with the issue of whether lying on behalf of law enforcement rendered a <u>Miranda</u> waiver involuntary.  When Petary was interviewed by the FBI, he was told that another kidnapping suspect was currently undergoing questioning and was talking and would probably place full blame for the crime on him, even though the suspect had refused to cooperate and did not make any statements.  <u>Id.</u> at 460.  The Eighth Circuit concluded that even where police had lied to the defendant about their

37

interrogation of another suspect, the misrepresentation on the part of the government did not make a statement per se involuntary, but was merely one factor to be considered in reviewing the totality of the circumstances.  Id. at 461 (citations omitted). The Court found, based on the totality of the circumstances, that Petary acted knowledgeably and freely when he made the incriminating statements.

In this case, although Deputy Fry did tell Oscar Estrada that Soto had just made a statement, when he had not, there is no evidence before this Court to support Oscar Estrada's claim that the statement implicated him in any way.  To the contrary, Deputy Fry never said what Soto had allegedly stated about his involvement, much less about Oscar Estrada's involvement in the conduct giving rise to their arrest.  Based on the totality of the circumstances leading up to the administration of the Miranda warning to Oscar Estrada, this Court finds that Deputy Fry's lie about Soto giving a statement does render Oscar Estrada's waiver involuntary.

3.     Pre-Miranda Questioning About Family

Oscar Estrada argued that Deputy Fry improperly asked questions of him prior to issuing the Miranda warning that elicited information regarding his family and then this information was used against him during his Mirandized interview to get him to confess to criminal conduct.[15]  See Oscar Estrada Mem. at pp. 4-5, 14.  The pre-Miranda

_____

[15]     Oscar Estrada also maintained that Deputy Fry questioned him about his ties to Soto before he was given his Miranda rights and then used that information during the interview to cause him to confess to criminal conduct.  See Oscar Estrada Mem. at pp. 4-5, 14.  However, Oscar Estrada never pointed this Court to any part of his interview where Deputy Fry used pre-Miranda information regarding Soto to get him to talk during his Mirandized statement.  Instead, Oscar Estrada's focus was on questions that were elicited by Deputy Fry regarding Oscar Estrada's family.  Id. at p. 5.

statements regarding Oscar Estrada's family were obtained as part of Deputy Fry

asking Oscar Estrada the following background questions:

> MV1:  Um, before I ask him any questions regarding that. I'm
> going to ask him some questions about his name, uh, phone
> number, where he's from and all that.
>
> * * *
>
> MV1:  Are you married?  Do you have kids?
>
> INT:  *Uh, are you married? Do you have children?*
>
> EST:  *Yes.*
>
> INT:  Yes.
>
> MV1:  Where are your kids and wife?
>
> INT:  *Where are children and wife?*
>
> EST:  *Mexico.*
>
> INT:  Mexico.

Transcript, 6:14, 7:57-8:12 (emphasis in original).

The portion of the <u>Mirandized</u> interview that Oscar Estrada claimed Deputy Fry

used this information regarding his family in order to get him to answer questions was

as follows:

> MV1:  Before he answers, I want you to tell him this.  This is
> the time where he needs, Oscar needs to think about Oscar
> and not his buddies because his buddies are not going to
> protect him from going to federal prison, only Oscar is.  This
> is Oscar's life ok, not his friend's life.  <u>If</u> he's got a family and
> kids, that's what he needs to think about.  He needs to think
> about himself, not his buddies.

Transcript, 24:10 (emphasis added); see also Oscar Estrada Mem. at p. 5.[16]

This Court finds that questions asked by Deputy Fry about Oscar Estrada's familial status was neither improper nor improperly used during the interview of him. Routine information necessary for basic identification purposes is not interrogation under Miranda, even if the information elicited turns out to be incriminating.  See United States v. Brown, 101 F.3d 1272, 1274 (8th Cir. 1996); see also United States v. Reyes, 908 F.2d 281, 292 (8th Cir. 1990) ("Miranda warnings are not required before the asking of routine booking questions to gather background biographical information.") (citation omitted).  In addition, "[o]nly if the government agent should reasonably be aware that the information sought, while merely for basic identification purposes in the usual case, is directly relevant to the substantive offense charged, will the question be subject to scrutiny."  Brown, 101 F.3d at 1274 (emphasis added); see also Reyes, 908 F.2d at 293 ("In addition, the relationship of the question asked to the crime suspected is considered highly relevant.") (citation omitted).

---

[16]  The Court notes that Oscar Estrada deleted the word "if" cited above in his direct quote to the transcript.  See Oscar Estrada Mem. at p. 5.  However, the Court also notes that the interpreter did not use the word "if" in the translation.  The translator stated:

> *Very well, before you answer that question, I need you to think only, and only for you Oscar, because only your life is on the line.  Forget about your friends because your friends aren't going to prevent you from going to jail, or anything like that.  And it seems you have a family, that you love them; you have children.  So now stop thinking of your friends and think of yourself.  That is, that is for your wellbeing.*

Transcript, 23:34 (emphasis in original).

Deputy Fry's inquiry into whether Oscar Estrada was married, whether he had children, and their location, constitutes routine background biographical information and therefore, a <u>Miranda</u> warning was not required prior to subjecting Oscar Estrada to this line of questioning.   Further, information regarding Oscar Estrada's family and their location had no bearing on the narcotics charges that have been brought against him. Moreover, this Court finds that Deputy Fry's statements to Oscar Estrada about his family and kids -- <u>i.e.</u>, he should think about them -- was not sufficiently coercive in nature as to render his statement to Deputy Fry involuntary.   <u>See</u> <u>generally</u>, <u>United States v. Astello</u>, 241 F.3d 965 967-68 (8th Cir. 2001) (holding that tactics such as subjecting a suspect to psychological pressure, making false promises, playing on a suspect's emotions, and using his family against him did not render a confession involuntary); <u>see</u> <u>also</u> <u>United States v. Santos-Garcia</u>, 313 F.3d 1073, 1079 (8th Cir. 2002) ((holding that the statement that defendant's "children would be driving by the time he would be released from prison was not unduly coercive.   Rather, it was merely an 'accurate representation[] of [defendant's] predicament").   As such, this Court does not find that the inquiry into Oscar Estrada's familial status without a <u>Miranda</u> warning, or the subsequent mention of his family during the <u>Mirandized</u> interview, was improper or warrants the suppression of any part of Oscar Estrada's statement to Deputy Fry.

### 4.    Coercive Tactics used After Miranda Warning

Oscar Estrada's claim that post-<u>Miranda</u> statements made by him were involuntary due to the continued coercive tactics by Deputy Fry is without merit.   <u>See</u> Oscar Estrada Mem. at p. 12.   A confession is involuntary if it is obtained under

circumstances that overbear a defendant's will.  Lynumn v. Illinois, 372 U.S. 528, 534 (1963).  "Although the requirement that a Miranda warning be given does not dispense with the voluntariness inquiry, 'cases in which a defendant can make a colorable argument that a self-incriminating statement was compelled despite the fact that the law enforcement authorities adhered to the dictates of Miranda are rare.'"  Simmons, 235 F.3d at 1132 (quoting Dickerson v. United States, 530 U.S. 428 (2000)).

During his interview, and after being Mirandized, Oscar Estrada was reminded again by Deputy Fry that he was facing substantial prison time, depending on his cooperation, and he was told not to lie, that the officers would leave if he continued to lie, and that he would lose the opportunity to help himself if he kept lying.  See Transcript, 16:48-17:33, 21:13-40, 21:56-23:57, 25:18-26:52.  These facts do not suggest that defendant was deliberately coerced or that improper tactics were used against him.  See LeBrun, 363 F.3d at 725 (finding that a  promise made by law enforcement does not render a confession involuntary per se); Simmons, 235 F.3d at 1133 (concluding that "[o]fficers may elicit statements by claiming not to believe the accused's denials" and that truthful and noncoercive statements of the possible penalties which an accused faces may be given to the accused without overbearing his free will) (citation omitted); Jenner v. Smith, 982 F.2d 329, 334 (8th Cir. 1993) (citations omitted) (finding that tactics such as a raised voice will not render a confession involuntary unless the overall impact of the interrogation caused the defendant's will to be overborne).  Therefore, based on the totality of the circumstances, the Court

concludes that Oscar Estrada's post-<u>Miranda</u> statement to Deputy Fry was not the product of coercive or improper tactics.

                5.    <u>Conclusion</u>

The record demonstrates that Oscar Estrada understood Deputy Fry, was never physically threatened, did not appear to be under the influence of any alcohol or drugs, never requested any food or water, and the interview only lasted 30 minutes.  Tr. 35. Oscar Estrada's ability to resist tactics used by Deputy Fry to get him to provide information was never compromised, and his ability to protect his rights, as exemplified by his request for an attorney during the interview (Transcript, 28:08).  <u>See</u> <u>Simmons</u>, 235 F.3d at 1132-33 (finding that the totality of the circumstances, including the defendant's capacity to resist any pressure, is relevant to whether a statement made is voluntary).

In sum, given the totality of the circumstances, the Court concludes that the statements made by Oscar Estrada on June 5, 2005 up to 28:08, were the voluntary product of a knowing and voluntary waiver of his <u>Miranda</u> rights.  For all the reasons stated above, this Court finds that Oscar Estrada's motion to suppress statement, up to 28:08 in the Transcript, should be denied.

      **C.**    **<u>Statement Made by Soto</u>**

Soto argued that the statement taken from him by Trooper Frisby should be suppressed, as it was fruit of the illegal stop and search of the vehicle.  Soto's motion to suppress statements taken from him by Trooper Frisby should be suppressed, should

be denied based on this Court's finding that the June 4, 2007 stop and search of the Maxima was valid.  <u>See</u> Report and Recommendation section IIA-B, <u>supra</u>.

<u>**RECOMMENDATION**</u>

For the reasons set forth above and based on all the files, records, and proceedings herein,

**IT IS RECOMMENDED THAT:**

1.      Defendant Eduardo Soto's Motion to Suppress Tangible Evidence [Docket No. 35] be **DENIED**;

2.      Defendant Oscar Javier Estrada's Pretrial Motion for Suppression of all Physical Evidence [Docket No. 43] be **DENIED**;

3.      Defendant Oscar Javier Estrada's Motion for Suppression of all Statements [Docket No. 44] be **DENIED** in part and **DENIED** in part as moot with regards to statements made by defendant after he made a request for an attorney; and

4.      Defendant Juan Manuel Estrada's Motion to Suppress Evidence [Docket No. 48] be **DENIED**.

Dated:       September 25, 2007

<i>s/ Janie S. Mayeron</i>

JANIE S. MAYERON
United States Magistrate Judge

Under D.Minn. LR 72.2(b) any party may object to this Report and Recommendation by filing with the Clerk of Court, and serving all parties by **October 4, 2007**, a writing which specifically identifies those portions of this Report to which objections are made and the basis of those objections.  A party may respond to the objecting party's brief within ten days after service thereof.  All briefs filed under this Rules shall be limited to 3500 words.  A judge shall make a de novo determination of those portions to which objection is made.  This Report and Recommendation does not constitute an order or judgment of the District Court, and it is therefore not appealable directly to the Circuit Court of Appeals.